

FILED

JUN - 6 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                               |   |                    |
|-------------------------------|---|--------------------|
| **UNITED STATES OF AMERICA**  | : |                    |
|                               | : |                    |
|                               | : | **CRIMINAL NO.**   |
| **v.**                        | : | **15-175(CRC)**    |
|                               | : |                    |
|                               | : |                    |
| **JOSEPH ANTHONY CAPUTO**     | : |                    |
|                               | : |                    |
| **Defendant**                 | : | **May 31, 2016**   |

### DEFENDANT'S MOTION TO DISMISS

The Defendant, **JOSEPH ANTHONY CAPUTO**, by and through his undersigned Counsel, hereby moves this Honorable Court for an Order directing dismissal of the within cause, brought pursuant to 18 U.S.C. §1752(a)(1), and also brought in violation of Defendant's rights to Freedom of Speech and to Petition the Government with Grievances, in accordance with the First Amendment of the United States Constitution. This Motion having been made, is hereby supported and accompanied by Defendant's Memorandum of Law Dated May 31, 2016.

BY:_____

Stephan E. Seeger (D.C. Bar # 431258)
Law Offices of Stephen J. Carriero, LLC
810 Bedford Street, Suite #3
Stamford, CT 06901
(203) 273-5170
(203) 357-0608
seegerkid2@aol.com

# ORDER

The Defendant, **JOSEPH ANTHONY CAPUTO**, having moved this Court for an Order of

Dismissal, and in support thereof having filed **DEFENDANT'S MEMORANDUM OF LAW IN**

**SUPPORT OF MOTION TO DISMISS,** dated May 31, 2016, it is **HEREBY ORDERED AS**

**FOLLOWS:**

   1. As to Defendant's Motion to Dismiss:

**GRANTED  /  DENIED**

   2. As to Defendant's Request for Hearing in connection with Motion to Dismiss

**GRANTED  /  DENIED**

and the Date and time of said Hearing shall be determined by the Court notice to parties will follow, OR is

hereby fixed as follows:

_____, _____, 2016, at    _____AM/PM, Federal District Courthouse _____ ,

Washington D.C., to be held in Courtroom _____ ,

DATED AT WASHINGTON D.C., THIS _____ DAY OF _____, 2016

_____
CHRISTOPHER R. COOPER
JUDGE, UNITED STATES DISTRICT COURT

_____
DATE

## CERTIFICATION

I, hereby certify that on June 3, 2016, a copy of the foregoing **MOTON TO DISMISS** with accompanying **ORDER**, was filed electronically and/or served by email via agreement upon all parties as indicated hereinafter. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

ARI REDBORD
(DC BAR #: 476 998)
Assistant United States Attorney National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7018
Ari.Redbord@usdoj.gov

BY: _____

Stephan E. Seeger (D.C. Bar # 431258)
Law Offices of Stephen J. Carriero, LLC
810 Bedford Street, Suite #3
Stamford, CT 06901
(203) 273-5170
(203) 357-0608
seegerkid2@aol.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | **CRIMINAL NO.** |
| v. | : | **15-175(CRC)** |
| | : | |
| | : | |
| JOSEPH ANTHONY CAPUTO | : | |
| | : | |
| Defendant | : | **May 31, 2016** |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

The Defendant, **JOSEPH ANTHONY CAPUTO**, by and through his Counsel, has

moved this Honorable Court for an Order dismissing the within cause of action brought against

the Defendant by the Government pursuant to 18 U.S.C. §1752(a)(1), and the same having been

brought against the Defendant in violation of Defendant's rights to Freedom of Speech and to

Petition the Government with Grievances, pursuant to the First Amendment of the United States

Constitution. This Memorandum of Law is made in support of said Motion to Dismiss dated

May 31, 2016.

## I. FACTUAL BACKGROUND

On Thanksgiving Day, 2015, wrapped in an American Flag, carrying a pocket

Constitution in his trousers, and a self-authored "re-written" Constitution in his mouth, Joseph

Caputo jumped a perimeter fence at the White House. Upon landing, he immediately and

voluntarily placed his hands in the air, and before witnesses who captured the landing on video,

he shouted "I love my country." Mr. Caputo was completely unarmed, and by all accounts his

entry was non-violent. He was apprehended immediately by Secret Service officials, to whom

he can be seen on video surrendering, and whose instructions to drop to his knees and remain

still are completely obeyed.  Upon physically apprehending a fully surrendered and submissive Mr. Caputo, the Secret Service simply escorted him into custody.

Mr. Caputo's arrest was completed without incident, and post-arrest he was immediately hospitalized for mental health evaluation; Mr. Caputo has a history of Aspbergers, an Autism spectrum disorder.  He was evaluated, and permitted to leave the D.C. facility after two days, in order to freely and voluntarily attend his first Court appearance.  Thereafter he was released on bail with conditions set by this Court, and he returned to his home State of Connecticut to live with his mother, and to be supervised by pre-trial bail services in Bridgeport Connecticut, during the pendency of this case.  Since the incident, the Secret Service has investigated Mr. Caputo's background, and interviewed family members and others who know Mr. Caputo.  Noteworthy is the fact that the Secret Service investigation, spanning all the way to Connecticut, involving multiple family members, friends and associates, has not resulted in any increased security at the White House, or any enhanced or extra bail conditions being placed upon Mr. Caputo himself. He was essentially released into his mother's custody with a curfew permitting school and work activities, a mental health evaluation condition, notice of movement requirements with electronic monitoring, and a "stay away" order keeping him out of Washington D.C., except for Court.  He has breached no condition, and has fully complied with what has been expected of him.

It is the Defendant's position that he entered the White House grounds with a noble purpose, to call attention to various deficiencies in the Constitution, at a time when the Government, in his view, was too preoccupied with foreign affairs and "terror" issues to pay attention to domestic issues, including security at home, as demonstrated by the Government's inability to solve a seemingly simple problem, such as the height of the White House fence.  The act of jumping the fence post-modification, illustrates the point Mr. Caputo sought to raise, and

2

drew attention to his message of change. Mr. Caputo used the failure and inadequacy of the Government's solution to a straightforward domestic problem (security around the White House), to draw attention to his claims, and the need for Constitutional change.

The fence jumping, which is alleged to have constituted a crime committed by Mr. Caputo, is inextricably linked to the point Mr. Caputo was expressing. The jump drew attention to the protest, and presumably, the Government has read the rewritten constitution now that the same is in evidence in a Federal case. Mr. Caputo's attempt to express himself was geared toward using the jump as a symbol, and to highlight his message. His conduct is no different than other types of expressive conduct including picketing, or lying down in protest, in an effort to draw attention to a message. Clearly, not every uninvited or unpermitted entry or remainder on White House property, ipso facto, constitutes a crime. The entry or remainder must be viewed in connection with the purpose and/or the "what next."

Since the inception of the prosecution, there has been ample evidence of Mr. Caputo's compliance and incident free record of good behavior. In spite of these facts, and without the benefit of the mental health evaluation ordered by this Court, the Government's position is that this matter must be prosecuted, and Mr. Caputo's case is not one ripe for "deferred prosecution," or "deferred sentencing." A plea or a trial appears to be the only avenues open to the Defendant. Counsel's position is that the charge is a misdemeanor, involving no violence, and a "conviction" disposition in this case is incommensurate with (1) Mr. Caputo's First Amendment rights, and (2) with the Government's resolution of similar, yet favorably distinguishable cases, where prosecution was not pursued, was deferred and/or a plea was entered with a deferred sentence anticipating future dismissal.

Accordingly, the Defendant moves this Court to dismiss the charge against him, and to the extent necessary to advance his "as applied" challenge, he requests a full evidentiary hearing requiring the Government to prove his "knowing" conduct, and why it is unprotected speech. The Defendant asserts that the federal Unlawful Entry statute is unconstitutionally Vague, Overbroad, and unconstitutional "as applied" to the Defendant, based upon the conduct with which he is charged. The bases for the Defendant's claims follow.

## II.   STATUTORY ANALYSIS: 18 U.S. Code § 1752(a)(1)

The Unlawful Entry statute under which Mr. Caputo is charged, is broken into various incidents of proscribed conduct, with corresponding scienter elements.  It presents as a typical trespass statute, stating:  "whoever . . . knowingly enters or remains in any restricted building or grounds without lawful authority to do so . . . shall be punished as provided in subsection (b).  18 U.S. Code § 1752(a)(1). It is a misdemeanor criminal statute, a violation of which carries a maximum sentence of one year imprisonment, a fine of $100,000.00 pursuant to 18 U.S.C. § 3571(b)(5) and/or a term of supervised release of not more than one year pursuant to 18 U.S.C. § 3583(b)(3).

The "place" sought to be regulated is expressly defined as "restricted buildings or grounds;" thus, any "posted, cordoned off, or otherwise restricted area" including, in relevant part:

> (a) . . . the White House Grounds, or the Vice President's official residence . . . or grounds;
>
> (b) of a building or grounds where the President or other person protected by the Secret Service is, or will be temporarily visiting;

18 U.S.C. 1752(3)(a) & (b).

4

The current statutorily required <u>mens rea</u> element has recently been changed from "knowingly and willfully" to simply "knowingly." <u>See</u> H.R. 347, 113th Cong. (2012). Clearly, dropping the additional mental state required to prove conduct under the current statute, dilutes the Government's burden of proof, making it easier to prosecute (and presumably to convict) under the current scheme. Removing the "willfulness" element eradicates the Government hurdle of proving that Mr. Caputo knew he was acting illegally, in order to convict him. <u>See</u> <u>infra</u>, <u>Dixon v. U.S.</u>, 548 U.S. 1, 5 (2006) (stating that willfulness requires "act[ing] with knowledge that his conduct was unlawful"). The reduced standard, and the ease with which the Government might successfully prosecute under the current statute, requires an even more vigilant approach where First Amendment rights are at stake, and chilling and self-censorship effects upon speech must be guarded against.

The term "knowingly" is not as easily understood as first glance would suggest. According to the United States Supreme Court:

> [T]he word "knowingly," in most statutes does not require proof that the defendant knew he was violating the law. "The term "knowingly" does not necessarily have any reference to a culpable state of mind or to knowledge of the law. As Justice Jackson correctly observed, 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.'

<u>See</u> <u>Bryan v. United States</u>, 524 U.S. 184, 192, (1998) (citations omitted). While the term is said not to refer to a culpable state of mind or knowledge of the law, it is the prescribed <u>mens rea</u> element for the statute currently under review, and its meaning can be evasive. While the Supreme Court tells us that it is a "factual" determination, it also tells us that it has nothing to do with a "culpable state of mind," or "knowledge of the law." The latter disjunct appears consistent with definitions offered by the Circuits, however, the idea that "culpability" is not

5

being referred to appears somewhat inconsistent with how the statute defines the crime of

Unlawful Entry.

The Model Penal Code offers a slightly different alternative stating:

> A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves an element of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

Model Penal Code, 2.02(2)(b). It would appear then, that Mr. Caputo would have to be aware

that his conduct is practically certain to result in an "unlawful entry." Clearly, however, Mr.

Caputo is entitled to a good faith belief in his non-violent and peaceful expression, and therefore,

he is not entering the White House grounds "unlawfully," simply because he enters without

invitation. If a defendant intends to jump the White House fence solely to express himself and

his concerns, fully believing the same to be a rightful and lawful exercise of his First

Amendment rights, he or she would never, by definition, be practically certain that conduct

would result in an "unlawful entry." If his belief is that he is exercising his First Amendment

rights, not only should he not be required to "guess," to avoid criminal prosecution, he ought also

to be entitled to rely upon a reasonable belief that his conduct will not result in an Unlawful

Entry charge. And further, even if he were to be arrested, he would not be committing a crime in

exercising his First Amendment rights.

The Supreme Court has clarified the definition of "knowingly" more recently, stating that

"'knowingly' merely requires proof of knowledge of the facts that constitute the offense." See

Dixon v. U.S., 548 U.S. 1, 5 (2006). And elsewhere again, stating that

> [T]he defendant does not need to 'know that his conduct is illegal before he may be found guilty. The familiar maxim 'ignorance of the law is no excuse' typically holds true. Instead, our cases have explained that a defendant generally must know the facts that make his conduct fit the definition of the offense,"

6

See Elonis v U.S., 135 S.Ct. 2001, 2009 (2015).   In order to be convicted of a criminal offense, Mr. Caputo has to engage in the proscribed act of "entering" the White House grounds, with the requisite state of mind ("knowingly"); thus, he would have to enter the grounds with knowledge of the facts that make his conduct fit the definition of the offense. Elonis, supra, at 2009.  The definition of the offense under the statute is: "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." Therefore, Mr. Caputo would have to enter the White House grounds with an awareness he lacked "lawful authority" to do so.

The problem with the definition, of course, is that it arguably begs an important question, when viewed against the backdrop of the Unlawful Entry statute.  It is difficult to reconcile the Supreme Court's definition of "knowingly," to produce a conclusion that Mr. Caputo does not have to know his conduct was illegal or unlawful—which is exactly what the Court's definition of "knowingly" appears to suggest.  Construed any other way, the "lawful authority" language of the statute would be relegated to mere surplusage.  Adding a common definition of "lawful" does little to assist in the quagmire.  Black's Law Dictionary 1032 (4th ed. 1968), defines *lawful* as: "Legal; warranted or authorized by the law; having the qualifications prescribed by law; not contrary to nor forbidden by the law." Id.  Even armed with this insight into the common meaning of "lawful," the free speaker charged with knowledge of the statute, has little more to work with than a law which tells him prohibited conduct is ultimately that which is forbidden, or contrary to the law!

Ultimately, the statute does not reasonably place the Defendant on notice of the proscribed conduct, and the expectation that anyone seeking to exercise free speech rights must first determine "lawful authority" inherent in their conduct, clearly places a chilling effect on speech.  The threat of self-censorship and the chilling effect upon constitutional activity clearly

7

call for a citizen not to be forced to iron out unclear contours or parameters of a statute, or face prosecution and a trial. The manner in which the Unlawful Entry statute is written is so broad, that it inevitably encompasses constitutionally protected speech.

The Unlawful Entry statute under which Mr. Caputo is charged appears to be clothed in qualifying language, requiring more than mere "entry;" clearly it requires knowledge that the entry is undertaken without "lawful authority." Accordingly, unless the Government claims that no unpermitted entry can ever be justified, any citizen expressing free speech or protesting would have to "guess" whether the tone of his protest or expression is somehow unlawful.

Moreover, if "knowingly" encompasses the "lawful authority" prong of section (a), then the statute is even more confusing, requiring more guess work, and certainly does not provide the notice necessary for a citizen to exercise the important right of free speech without risking criminal prosecution. As the Supreme Court states: "The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." See Dombrowski v Pfister, 380 U.S. 479, 487 (1965)(citations omitted). Based upon the language, and the definition of the criminal conduct, it is unclear what would constitute "lawful authority" to enter upon White House grounds, and the lack of clarity impinges upon First Amendment rights. It places a chilling and self-censorship effect upon free speech relating to "entry" upon White House grounds. The proscription is overly broad since clearly some protected speech can involve uninvited or unpermitted entry/remainder upon White House grounds, and the lack of clarity will result in decreasing or suppressing otherwise protected speech.

### III.  LEGAL ARGUMENTS

#### A.  The Statute is Overly Broad Proscribing Unintended Constitutionally Permissible Conduct/Expression

The Overbreadth doctrine "strike[s] a balance between competing social costs." See U.S. v. Williams, 553 U.S. 285, 292 (2008).  Specifically, the doctrine seeks to balance the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional," with the possibility that "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech".  Id. at 292.  Challenges commonly arise in cases such Mr. Caputo's, where a statute tries to prohibit or criminalize behavior protected by the First Amendment.

Overbreadth is distinguishable from, but related to "vagueness," since an overbroad law is often too vague for a reasonable person to understand what behavior is actually covered. Generally, if a prohibition is expressed in a way that lacks clarity regarding whether expressed conduct is legally permissible, actors tend to avoid the conduct that risks the prosecution and/or punishment.  In such a case, the statute's effect is exceedingly broad capturing unintended conduct, which might otherwise constitute fully welcome speech and/or expression.

As the Supreme Court explains in Virginia v Hicks:

> [T]he expansive remedy [of an overbreadth declaration emanates from] concern that the threat of enforcement of an overbroad law may deter or "chill" constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions. See *Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Bates v. State Bar of Ariz.,* 433 U.S. 350, 380, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, *Dombrowski, supra,* at 486–487, 85 S.Ct. 1116—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas. Overbreadth adjudication, by suspending *all* enforcement of an over inclusive law, reduces these social costs caused by the withholding of protected speech.

Virginia v. Hicks, 539 U.S. 113, 119 (2003).  Notably, and consistent with the underlying policy, the Overbreadth doctrine permits challenges by an affected party, based on the First Amendment rights of others.  See, e.g., Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 483 (1989); and also, R. A. V. v. City of St. Paul, 505 U.S. 377 (1992).

Courts require that defendants claiming overbreadth bear the burden of demonstrating, "from the text of [the law] and from actual fact" that substantial overbreadth exists.  See e.g., Hicks, supra, 539 U.S. 113 (2003) (finding First Amendment overbreadth violation in case of policy banning flyer handouts prior to obtaining a manager's permission because speech found distasteful or offensive could be limited by exercise of manager's discretion).  "[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds".  See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984).

The Unlawful Entry statute in the present case bears all of the hallmarks of overbreadth. "From the text," the analysis begins with a problematic statutory marriage between "knowingly," and "unlawful authority."  Neither term is defined in the statute, and when the two are paired and read against the backdrop of Supreme Court jurisprudence, a would-be free speaker analyzing the statutory proscription would encounter confusion of a Constitutional proportion.  The would-be free speaker certainly cannot be expected to know all of the facts that constitute the "offense," unless he or she knows what "knowingly entering a restricted area without "lawful authority" actually means.  The pairing of the concepts presents a situation where, a would-be free speaker would have to know what would constitute "lawful authority" or perhaps "unlawful presence," in order to calculate or balance the risks of engaging in her expression.  The First Amendment right

she enjoys is chilled and undermined, in direct proportion to the lack of clarity and confusion attendant upon the math.

The Unlawful Entry statute fails to provide language or an accessible meaning sufficient to curb guesswork, and commensurate with permitting the would-be speaker to make an informed decision. Analyzing this statute, the risk-taking free speaker, of necessity, finishes his interpretation right where he begins, based upon the definition of "knowingly" and its relationship to the concept of "lawful authority" (which is a critical aspect of the definition of the crime). The very law and/or regulation the would-be free speaker must consult to determine the constitutionality of his expression, prior to risking the behavior, tells him little more than if he (1) knows the facts that constitute "unlawful" entry, or (2) he knows the facts that make his conduct fit the definition of the offense, then (3) he violates the law by engaging in such expression. The expected analysis appears to beg its entire question. Speculation and guesswork is found where, in light of the important rights at stake, a greater modicum of certitude is demanded. Furthermore, the free speaker naturally figures his free speech rights into the equation, and most persons convinced of the validity of their passive and peaceful protest, or expression, have little reason to believe that their conduct is "unlawful," or the nature of the facts that make their conduct "unlawful."

Moreover, the logic of requiring one to know the facts that convert an entry into an entry without lawful authority, where the lawfulness itself is undefined, is confounding. Knowledge of what is "lawful" is ontologically prior to knowledge of the facts that make one's conduct unlawful—how otherwise, would the set of facts be identifiable? The offense is essentially "knowingly entering restricted grounds without lawful authority." But the scienter element as defined by the Supreme Court of the United States appears to set the reader (would-be free

11

speaker) on a chartered course of circular reasoning. Desiring to determine whether his conduct

is legally permissible, he is required to know every fact that makes his conduct fit the offense—

in other words, every fact that makes his behavior an unlawful entry!  The interpretation of this

statute requires guesswork, and places a chilling and self-censorship effect on speech for this

very reason. The effect of the requirement, that the speaker rule out his conduct as being

"unlawful," is far too onerous and convoluted an analysis to facilitate even remote certainty as to

what is proscribed. Accordingly, far fewer free speakers would risk otherwise constitutionally

permissible conduct, and overbreath is not only possible, it is a significant inevitability.

Moving from the language itself, to the "factual" analysis, without the benefit of a record,

including testimony or other evidence establishing the point, it is not difficult to estimate how

this statute would confuse clearly conscientious free speakers, who would enter the grounds of

the White House for the purposes of almost any type of demonstration, protest, or petition for

grievance. If a person wandered into a restricted ground via an open door, or accessible yet

private alleyway, in order to peaceably protest a hike in taxes by holding up a sign, or delivering

the President a "get well soon" card along with a "sympathy" card demonstrating long waits in

hospitals under Obama Care are killing people, the conduct is presumably criminal. These

examples involve entries without permission or authority, to deliver a message of change. There

is no difference between this conduct, and the conduct attributable to Mr. Caputo; the fence is

not the tail that wags the constitutional dog.

Mr. Caputo, and the two actors in the examples above, all face a statutory proscription

that must lend itself to fair interpretation, and the entry by fence, alley, or open door, appears

irrelevant for present purposes of establishing overbreadth. Each actor faces the daunting task of

attempting to understand the Unlawful Entry statute, and its applicability to the choice of

expressive conduct. Thus, the First Amendment is violated to the extent that many more seemingly gentle, less physically risky, or less "shocking" entries could be criminalized, but nonetheless amount to perfectly protected speech.

Unless the actors in the example "know the facts" that make their conduct fit the definition of the crime in the statute (knowing entry upon restricted grounds without lawful authority), none could properly consider whether their actions would be criminal. Thus, the actor either risks being charged, or she refrains via self-censorship or through experiencing the chill of uncertainty. Notably, the free speaker acting in the name of the First Amendment right to protest does not ordinarily, ab initio, consider his conduct illegal. As argued elsewhere here[2], in the free speaker's mind, the First Amendment is actually the source of lawful authority!

### B. As an Alternative to Overbreath, the Statute is Void for Vagueness for the Same and/or Similar Reasons

Vagueness doctrine has its roots in the Due Process Clause of the Fifth Amendment. A criminal conviction cannot comport with the dictates of due process, where a statute underlying the conviction fails to provide a person of ordinary intelligence with adequate notice of what is prohibited. Likewise, where the statute is so "standardless" that it would result in and/or encourage discriminatory enforcement. See Hill v. Colorado, 530 U.S. 703, 732 (2000). In the First Amendment context, standing requirements are relaxed; one can argue overbreath based upon the lack of clarity where the statute regulates a significant amount of protected speech. See e.g., Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494–495 (1982).

---

[2] See section III C, infra, discussing "Vagueness" challenge as an alternative to Overbreadth, arguing that consideration by free speakers of statutory proscriptions begin from the presumption that they act with the authority of the First Amendment, and view relevant facts through ethnocentric eyes, constituting the functional equivalent of a wholly subject view of the conduct at issue.

In Williams, supra at 306, the Court noted that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." This indeterminacy is precisely what characterizes the convergence of the scienter element of "knowingly" and the notion of "lawful authority." Essentially, the Unlawful Entry statute calls on the interpreter to know every fact that makes his "conduct fit the offense." In other words, every fact that makes his behavior an entry without lawful authority. A person who believed that his entry was justified in the name of the First Amendment, however, would, have a wholly subjective view of the facts that fit, or fail to fit the statutory offense, in determining whether he entered with lawful authority. As noted in Williams, the Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'— wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." See Williams supra at 306, citing Coates v. Cincinnati, 402 U.S. 611, 614 (1971)(emphasis added).

The Unlawful Entry statute in this case contains language which converges to produce the functional equivalent of a wholly subject judgment—namely, judgment as to what the facts constitute an entry upon restricted grounds without "lawful authority." Anyone believing his conduct to fall within the ambit of permissible and protected speech, would naturally judge the relevant facts through ethnocentric eyes—from the perspective of the free speaker, the true believer. A person unfamiliar with or even opposed to the First Amendment would not, and likely could not, view the relevant facts in the same way. The presumption is that "objective" facts can be understood by any actor, in order for him to make an informed decision about whether his particular expression will be criminalized. In order to make any decision about the

14

legality of the conduct sought to be regulated, however, the same would be predicated upon competing or contrasting views of the applicability of the First Amendment. The right or lack thereof, colors the facts that determine the conduct fitting the offense. Therefore, the statute obviously encroaches upon the First Amendment, and leaves room for a world of selective and/or inconsistent enforcement, which may in turn further place a chilling effect on speech.

For reasons similar to those expounded in the Overbreadth analysis, as well as the indeterminacy inherent in the Unlawful Entry statute, the law offends the Defendant's constitutional rights and cannot form the basis of a conviction.

## C. The <u>Unlawful Entry Statute is Unconstitutional</u> <u>"As Applied" to Defendant</u>

The Unlawful Entry Statute is also unconstitutional "as applied" to the Defendant and the conduct under review in this case. By its own terms, the statute infringes on constitutional freedoms in the circumstances of his particular case. <u>See United States v. Christian Echoes Nat'l Ministry</u>, 404 U.S. 561, 565 (1972); <u>Lowery v. United States</u>, 3 A.3d 1169, 1175 (D.C. 2010). In the case of an "as applied" challenge the Government may continue to enforce the statute in different circumstances. Courts resolve such a challenge by working their way through several linked layers of analysis.

### 1. <u>Content Based versus Content Neutral</u>

The Free Speech clause of the Constitution has been interpreted to require greater justification for speech "content" regulations, while a lesser degree is reserved for regulations without regard to speech. The former are referred to as "content-based" regulations, while the latter are referred to as "content-neutral" regulations. The distinction between the types of regulation is significant; while the content-based regulation is premised upon what is <u>said</u>, the content-neutral regulation is premised upon either (1) <u>when</u>, <u>how</u> and <u>where</u> (Time Manner

15

Place-TMP) the speech is uttered, or (2) the regulation occurs only incidentally, emanating from the statutorily intended regulation of conduct unrelated to speech.

The U.S. Supreme Court distinguishes the two types of regulation stating that: "a restriction is content based only if it is imposed because of the content of the speech . . . and not because of offensive behavior identified with its delivery." See Hill v. Colorado, 530 U.S. 703, 737 (2000). And while "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word," Texas v. Johnson, 491 U.S. 397, 406 (1989), the Government cannot regulate expressive conduct without meeting standards designed to preserve free speech rights, and balancing such interests against the cherished First Amendment rights recognized in the Constitution.

### (a)  The Unlawful Entry Statute Can be Construed as Content-Based

While the Unlawful Entry Statute appears to have some legitimate governmental purpose, unrelated to speech, it does regulate "entry." Mr. Caputo's expression involved "entry," as an integral part of a message, and as a manner of communicating a point about Governmental inadequacy and distraction. The jump, in the then recent wake of successful fence jumpers, and the Government's attempt to remedy the trend by installing spikes upon the fence surrounding the White House, is inherently connected with Mr. Caputo's intended message—part of his making the point that the Government, in dealing with domestic issues, including even domestic security, fails, because of its preoccupation with "terror" issues plaguing the world.

As explained in Turner:

As a general rule, laws that by their terms distinguish favored speech, from disfavored speech on the basis of the ideas or views expressed are content based. See, *e.g., Burson v. Freeman,* 504 U.S. 191, 197, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992) ("Whether individuals may exercise their free-speech rights near polling places depends entirely on whether their speech is related to a political campaign"); *Boos v. Barry,* 485 U.S. 312, 318–319, 108 S.Ct. 1157, 1162–1163, 99 L.Ed.2d 333 (1988) (plurality opinion)

16

(whether municipal ordinance permits individuals to "picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not").

Turner Broad. Syst., Inc., v F.C.C., 512 U.S. 622, 643 (1994).  Mr. Caputo likewise has a First Amendment right to protest by jumping the White House fence accompanied by his rewritten Constitution, because of the relationship between the "entry" and the message.  In this sense, and for this reason, the Unlawful Entry statute exhibits a content-based restriction, and therefore, requires this Court's strict scrutiny.  Jumping the fence is the only way to demonstrate the inadequacy of the Government's remedy for fence jumping, and the jumping entry draws attention to the need for domestic security, versus instances of "terrorism" occurring around the world.  It is an instance of expression inherently connected to "entering" restricted grounds via jumping the White House fence.

The Supreme Court has recognized that content-based speech can have a "secondary effect" on certain types of speech, and such a law would still offend fundamental free speech interests by denying speakers the equal right to engage in speech by denying listeners the right to an undistorted debate.  Moreover, these rights are more precious when they involve a politically driven protest.  See Boos v. Barry, 485 U.S. 312, 337 (1998).  The Unlawful Entry statute's express "entry" proscription has a secondary effect upon Mr. Caputo's expressive conduct.  Not only is the protest in this case politically driven, but by using the word "enter," the statutory proscription would also prevent Mr. Caputo from expressing his message via the fence jumping, and being able to do so in public, in direct view of the Secret Service, who would apprehend Mr. Caputo and would be reasonably calculated to review his rewritten Constitution upon seizing it. The public and the Government, via the Secret Service, are Mr. Caputo's intended "audience."

Accordingly, the Statute can be construed as "content based," and therefore, unless the statute survives strict scrutiny, it violates Mr. Caputo's rights.

Under strict scrutiny analysis in free speech cases, a content-based regulation is permissible only if it is (1) narrowly tailored and the (2) least restrictive means to a serve a compelling government interest is satisfied. The requirement that a regulation impacting expression be narrowly tailored is satisfied so as long as the government's asserted interest would be achieved less effectively absent the regulation. When applying the strict scrutiny test, the government will have the burden of proving, presumably, that the protection of the President and/or the security of the restricted areas, constitute significant government interests which, when weighed against the expressive conduct of Mr. Caputo, outweigh his First Amendment rights.

The regulation must be narrowly tailored to serve a significant government interest. The definition of narrowly tailored provides that a regulation may only be "as broad as reasonably necessary to promote a substantial government interest that would be achieved less effectively without the restriction; no broader than absolutely necessary." Black's Law Dictionary (10th ed. 2014). If these standards are met, courts should defer to the government's reasonable determination. See Ward v. Rock Against Racism, 491 U.S. 781, 782-83, (1989). The substantial Government interest in protecting the president or the White House grounds could be achieved if would-be protesters were afforded the opportunity to remove themselves, or otherwise cure any unlawful entry, via compliance with a communicated order of cessation based upon the legitimate government interest.

The White House and all other public grounds are common places to engage in grievances and protesting. Ironically, the Unlawful Entry statute is easily construed to proscribe

virtually any unpermitted entry. The problem that arises with such sweeping proscription drew

the ire of Justice Ferren, dissenting, in <u>Smith v. U.S.</u> stating:

> "My concern, rather, is premised on the fact that, as presently administered, the
> White House is to some extent a public place. Customarily, the public is welcome on
> White House grounds at prescribed times and in specified areas. Until recently, in fact,
> the government permitted peaceful speech activities there. *Ante* at 966 n.5. It follows, and
> our cases so hold,[1] that if "the person lawfully in charge"[2] of the White House grounds
> asks a public invitee to leave—at the risk of otherwise violating a criminal, unlawful
> entry statute—elementary due process requires notice (forewarning) of a specific reason
> why that visitor has no "lawful authority to remain." D.C.Code 1973, § 22–3102. Without
> such notice, arrests and prosecutions for unlawful entry on public property could be
> arbitrary—at the whim of enforcers—for the statute itself provides no standard regulating
> conduct. Appellants had no proper notice that what they were doing was unlawful. As a
> consequence, their convictions should be reversed."

<u>Smith v. United States</u>, 445 A.2d 961, 970 (D.C. 1982) (Ferren J. <u>dissenting</u>). The Supreme

Court has recognized the need for notice, outside of statutory language proper, involving

communication by an authority as to why a visitor has no lawful authority to remain. <u>Id.</u> It is

difficult to imagine, short of a similar warning and/or communication how the Unlawful Entry

statute in the case at Bar would otherwise place an actor on notice, that his entry was without

"lawful authority." <u>See</u> infra, Part II, Statutory Analysis, pp. 3-8.

Notably, communications and warnings have traditionally played an important role in

Court determination of whether various instances of unlawful entry violate the First Amendment.

While Courts have found both for and against First Amendment rights, it is significant that

warnings, and the extent to which the same are complied with, are in some cases issue

dispositive. <u>See e.g.</u>, <u>Leiss v. U.S.</u> 364 A.2d 803 (1976) (finding no First Amendment violation

where disobedient protesters were arrested after reciting anti nuclear weapons speech on White

House grounds during regular hours, but refused to leave post closing hours after being

instructed their conduct would be considered unlawful at that point); <u>Smith v U.S.</u>, 445 A. 2d

961 (1982) (holding that protesters who laid in ashes on grounds inside the eastern gates of the

White House not protected by First Amendment in light of failure to comply with Secret Service

orders to move to avoid blocking traffic); Abney v. U.S. 451 A.2d 78 (1982) (upholding

protestor's First Amendment challenge where although he continued to lay upon the ground of a

government building after being told by authorities to move to avoid disrupting traffic, his

expressive conduct only "potentially" interfered with the government interest communicated

because it was after posted hours and traffic was non-existent). Thus, a pattern in cases falling

on both sides of First Amendment challenges illustrates the necessity of fair notice, and the

benefit of a deciding Court being able to determine an issue based upon notice and compliance.

To be sure, the statutory language is problematic on scores discussed to this point.
It is also difficult to imagine how a statute, if it is vague and/or overbroad, and fails to give

adequate notice, could be considered a "least restrictive" alternative in regulating expressive

conduct. Therefore, the statute violates Mr. Caputo's right to the extent that it fails the "least

restrictive means" prong outlined Ward, supra at 782-83.

### (b) Alternatively The Unlawful Entry Statute Can be Construed as Content-Neutral But is Nonetheless Unconstitutional

Government regulation of expressive activity is content-neutral as long as it is justified

without reference to the content of the regulated speech. See Ward v. Rock Against Racism, 491

U.S. 781 (1989)(quoting Clark v. Cmty for Creative Non-Violence, 468 U.S. 288, 293(1984).

Content-neutral regulation is subject to the lesser "intermediate scrutiny." Thus, the government

may, in the name of important Governmental objectives, impose reasonable restrictions upon the

time, place, or manner (hereinafter "TPM") of protected speech, provided that the restrictions are

(1) content-neutral, (2) narrowly tailored to serve a significant governmental interest, and (3)

leave open ample alternative channels for communications. See Lederman v United States, 291,

20

F3d 36, 44 (D.C. Cir. 2002) (quoting United States v. Grace, 461 U.S. 171, 177 (1983). Notably, a regulation cannot constitute a content-neutral TPM restriction, if either (1) the underlying purpose of the regulation is to suppress particular ideas, or (2) if the regulation, by its very terms, singles out particular content for differential treatment. See Browne v. City of Grand Junction, Colorado, 27 F.Supp. 3d 1161 (D.Colo. 2014).

As argued, supra, Part C(1)(a), the Unlawful Entry Statute can be construed to be content- based, and for this reason, to the extent the statute is recognized as such, it could not operate as a valid TPM regulation on expression. And, inasmuch as the statute must be narrowly tailored, and the Government interest in protecting restricted grounds and/or protecting the President are cognizable objectives likely to be construed as unrelated to speech, the content-neutral analysis most relevant here turns upon the "alternative means" requirement

If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication. See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 654 (1981); Edwards v. City of Coeur d'Alene, 262 F.3d 856, 866 (9th Cir. 2001). The Ninth Circuit struck down an ordinance that prohibited the height and width of pickets permissible for use in protest. The court reasoned that the City's assertion that the defendant could transmit his message effectively by shouting, singing, holding a sign in his hands, or leafleting, lacked forcefulness in the context of a march or parade, where individual voices cannot be heard and are easily drowned crowd noise Thus, these alternatives were not recognized as ample alternative means of communication. Id. at 867. Further, the Court noted that signs attached to poles or sticks are effective tools by which to overcome the communication problem plaguing these situations. Id.

Mr. Caputo sought to express his message in a manner conducive to ensuring it would be carefully considered;  just as the use of poles and sticks to enhance signs for use in a march were recognized as "effective tools" for vindicating First Amendment rights in Edwards, supra, Mr Caputo sought to overcome his "communication" problem by jumping the White House fence using gloves, an American Flag, and a rewritten constitution to express his message.  Like the Edwards protesters, leaflets, shouting that the fence remedy was inadequate, and/or simply mailing his rewritten constitution to the President, would not overcome the obvious and hardly disputable issue concerning the likelihood of his message ever being communicated effectively by such means.  The Edwards protesters were afforded a way to maximize expression and message communications, and Mr. Caputo's protest is no less deserving of First Amendment protections, simply because his means included a jump that most people could not make.

Furthermore, Mr. Caputo's protest was geared to an immediate audience, which included the public and the Secret Service.  His conduct bears this out; dressed in an American flag and otherwise in white and blue, he went over the fence and the first words uttered were "I love my country."  His hands were raised in the air for all to see, including the Secret Service, whose arrival was obviously anticipated.  Mr. Caputo never moved from the spot he landed;  he never attempted to run, escape the Secret Service, or get one inch closer to the White House.  His audience and message were joined, and the fulfillment of his protest was virtually complete upon landing and being apprehended by Secret service.  At no time did Mr. Caputo fail to comply with the Secret Service's orders to stay put, or lay on the ground.  He was escorted off property by what appeared to be a single agent, followed behind by one other, in an uneventful exit to a local psychiatric assessment facility.  All of this behavior is consistent with the aim of catering to one audience, without incident, in the context of a peaceful protest;  all of which appeared to Mr.

Caputo to be authorized as part and parcel of his First Amendment rights to freedom of speech, and freedom to petition his government.

And while the government interest in protecting White House grounds and/or the President are surely cognizable and significant interests, nothing about Mr. Captuo's behavior other than its unorthodox and/or unexpected nature, suggests that the safekeeping of the President was ever implicated, or that the brief landing on the White House grounds triggered the need for protection. More precisely, the Secret Service were dispatched automatically, to guard against any "potential" need to protect the grounds or the President. By the time they arrived at the scene, evidence seems to suggest that any "potential" had dissipated, and Mr. Caputo was escorted off the property as a matter of course, subject to follow up investigation. Notably, while in an analogous but somewhat different context, mere "potential" interference with Government interests has been recognized as a basis for upholding First Amendment rights over said interests. See e.g., Abney v. U.S., supra, at 78 (1982) (upholding protestor's First Amendment challenge where although he continued to lay upon the ground of a government building after being told by authorities to move to avoid disrupting traffic, his expressive conduct only "potentially" interfered with the government interest communicated because it was after posted hours and traffic was non-existent); see also, Wheelock v. U.S. 552 A.2d 503 (1988) (reversing convictions of protestors arrested for singing and praying in rotunda of Capitol building since security threat of protestors continuing the conduct only posing a potential threat insufficient to overcome First Amendment rights). Here, the need to protect the President or the White House grounds from Mr. Caputo is likewise non-existent; while any jumper may "potentially" interfere with such government interests, a statute proscribing "entry" in the manner outlined in the Unlawful Entry statute, cannot avoid proscribing a significant amount of protected speech.

23

Under a content-neutral analysis of the Unlawful Entry statute, Mr. Caputo's rights are violated in direct proportion to the restrictions placed upon his ability to communicate his message, and utilize an appropriate audience to do so. Such limitations run afoul of limitations upon the Government's recognized authority for TPM regulation. Since regulation that prevents a protestor from "reaching his intended audience" fails to afford a free-speaker "ample means of communication," the regulation inherent in the Unlawful Entry statute cannot pass constitutional muster.

## IV: DEFENDANT IS ENTITLED TO A HEARING

In <u>Dombrowski,</u> the Supreme Court appears to mandate that Trial Courts understand the obligation to conduct a pre-trial examination regarding whether a statute, though not unconstitutional on its face, is unconstitutional "as applied" to the particular case. The thrust of <u>Dombrowski</u> is that the permissible contours of a statute regulating expression should not have to be:

> hammered out case by case — and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation . . . . The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure. See <u>NAACP v. Button</u>, 371 U.S., at 432-433, 83 S.Ct., at 337-338; cf. <u>Baggett v. Bullitt</u>, 377 U.S., at 378-379, 84 S.Ct., at 1326 (1964); <u>Bush v. Orleans School Board, D.C.</u>, 194 F.Supp. 182, 185, <u>aff'd sub</u> nom. <u>Tugwell v. Bush</u>, 367 U.S. 907, 81 S.Ct. 1926, 6 L.Ed.2d 1250 (1961); <u>Gremillion v. United States</u>, 368 U.S. 11, 82 S.Ct. 119, 7 L.Ed.2d 75 (1961).

<u>Dombrowski</u>, 380 U.S. at 487.

Our Supreme Court, and lower Courts following its doctrine, clearly outlined a multi stepped process for challenging a statute as the same is "applied" to an individual such as Mr. Caputo. Whenever the challenge is made, the Defendant has the right to have the Court determine whether a "narrowing construction" will be applied. If the statute cannot be narrowed,

24

and still encompasses activity protected by the First Amendment, then an argument for overbreadth lies. Presuming, however, a narrow construction is viable, the Defendant is nonetheless entitled to a Court determination as to whether sufficient evidence exists to justify the "application" of the statute to the Defendant and his conduct.

Moreover, the Government must prove, strictissimi juris, the illegal and/or unprotected nature of the alleged conduct. See e.g., United States v. Spock, 416 F.2d 165, 172-3, 178 (1st Cir. 1969); and also, Noto v. United States, 367 U.S. 290 (1961). Our Courts traditionally insist that nobody is placed in jeopardy against the backdrop of a statute sought to be enforced contrary to First Amendment protections. Moreover, post trial acquittal is no substitute for the upholding of guaranteed protections, and a trial is therefore no substitute for a pretrial determination

It is well known that trials are difficult and unpredictable, and not even de facto innocence and/or unconstitutionality guarantees acquittal. And although the Court may decide the matter in favor of the accused without a hearing, the court may not deny it without one. As Justice Jackson pondering over a denied Trial level hearing stated: "I think we must consider the question on the well-pleaded allegations of the petition. Petitioner might fail to make good on a hearing; the question is must he fail without one?" See Shaughnessy v. United States, 345 U.S. 206 (1953) 219, at n. 2. Mr. Caputo is entitled to this Court's determination as to whether or not the Unlawful Entry statute is unconstitutional in its application, which would include a Government burden to prove the illegal conduct, and the manner in which the same is "unprotected," regardless of whether such proof would be led at trial.

## V. CONCLUSION

The Unlawful Entry statue is both Vague and Overbroad; it affords the would be free speaker little guidance as to what type of entry is proscribed. The statute as interpreted reveals a confusion that would almost certainly cause self-censorship and a chilling effect upon perfectly protected speech, and leaving its enforcement to the discretion of any authority. The statute is arguably content-based, since it proscribes "entry," upon restricted grounds, without "lawful authority." While it clearly seeks to regulate certain non-speech related conduct, its sweep is hardly narrow, and it inevitably implicates regulation of protected speech. To the extent that the statute is content based, viable TPM is not possible. Even if construed as content-neutral, it runs afoul of permissible TPM regulation since, among other reasons, it fails to afford a free-speaker "ample alternative means of communication" and therefore cannot pass Constitutional muster.

In the context of Mr. Caputo's "as applied" challenge, he is requesting, and should be granted a hearing, wherein the Government bears the burden of proof with respect to establishing the illegal conduct, and why the same is unprotected.

RESPECTFULLY SUBMITTED,
JOSEPH ANTHONY CAPUTO

BY: _____
Stephan E. Seeger (D.C. Bar ID#  431258)
Law Offices of Stephen J. Carriero, LLC
810 Bedford Street, Suite #3
Stamford, CT  06901
(203) 273-5170
(203) 357-0608
seegerkid2@aol.com

26

## CERTIFICATION

I, hereby certify that on June 3, 2016, a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DSIMSS**, was filed electronically and/or served by email via agreement upon all parties. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone able to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

TO:

ARI REDBORD
(DC BAR #: 476 998)
Assistant United States Attorney National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7018
Ari.Redbord@usdoj.gov

BY: _____

Stephan E. Seeger (D.C. Bar #  431258)
Law Offices of Stephen J. Carriero, LLC
810 Bedford Street, Suite #3
Stamford, CT  06901
(203) 273-5170
(203) 357-0608
seegerkid2@aol.com

27